Ewa C. Dawson # 7-6108]
Senior Assistant Attorney General
Jesse Naiman # 7-5516]
Senior Assistant Attorneys General
Wyoming Attorney General's Office
2320 Capitol Ave.
Cheyenne, Wyoming 82002
(307) 777-7862
(307) 777-8920 Facsimile
ewa.dawson@wyo.gov
jesse.naiman@wyo.gov

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| EMILY QUALLEN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 20-CV-21-J |
| | ) | |
| ALBANY COUNTY SHERIFF'S DEPARTMENT, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Defendants Aaron Gallegos and Christian Handley, in their individual capacities, through their undersigned counsel, submit this memorandum in support of their motion to dismiss.

**I. Introduction and claims**

This is a civil-rights case arising from an investigation of the allegation of sexual assault made by Plaintiff Emily Quallen. At the time of the incident, Quallen was a cadet in the Reserve Officers' Training Corps (ROTC). (*See* Doc. 1 at 2 ¶ 5). On the night of February 2, 2017, and into the morning of February 3, 2017, Quallen was allegedly sexually assaulted by a person with the

last name Parker, a fellow ROTC cadet. (*Id.*). She reported the alleged incident around February 5, 2017. (*Id.* at ¶ 6). Quallen was interviewed more than once in the course of the investigation. (*See id.* at ¶ 7). However, she challenges the constitutionality of the last interview conducted by Deputy Gallegos and Sergeant Handley of the Albany County Sheriff's Department. (*Id.* at 2-6 ¶¶ 5-24).

Quallen asserts that Gallegos and Handley violated her equal protection rights during their questioning about the alleged sexual assault. (*Id.* at 6 ¶¶ 25-30). Specifically, she claims that Gallegos and Handley's methods of questioning, including unjustifiable threats of prosecution for false reporting the alleged sexual assault, caused her to "retract her allegations." (*Id.* at ¶¶ 35, 36-38). She further claims that "one or more of the Defendants," presumably Doe Defendants 1-20, failed to intervene to prevent the alleged violation of her constitutional right. (*Id.* at 7 ¶¶ 31-34). Lastly, she generally seems to assert that Gallegos and Handley violated Wyo. Stat. Ann. §§ 1-40-203 and 6-2-319 (also known as the Wyoming Victim Bill of Rights) by showing Lieutenant Colonel Thomas Haas, Quallen's Professor of Military Science at the University of Wyoming, the video of their final interview of Quallen. (*Id.* at 5 ¶ 21).

Quallen is now suing Gallegos and Handley for damages under 42 U.S.C. § 1983. The federal claims against those Defendants should be dismissed on qualified immunity grounds and for failure to state a claim upon which relief can be granted.

## II.     Relevant factual allegations

These factual allegations come from Quallen's complaint, and generally must be accepted as true for the purpose of this motion. *See Cty. of Santa Fe v. Pub. Serv. Co.*, 311 F.3d 1031, 1034 (10th Cir. 2002). However, some of these allegations come from a transcript that Quallen attached to the complaint and incorporated by reference. (Doc. 1 at 3 ¶ 8). This Court may consider the

attached transcript when evaluating Quallen's complaint. *See Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001) ("[I]n deciding a motion to dismiss pursuant to Rule 12(b)(6), a court may look both to the complaint itself and to any documents attached as exhibits to the complaint."); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part thereof for all purposes").

On February 5, 2017, Lieutenant Colonel Haas became aware of Quallen's allegation of sexual assault and contacted the Albany County Sheriff's Department to report the allegation. (Doc. 1 at 2 ¶ 6). Subsequently, Quallen reported to the Sheriff's Department that she was sexually assaulted by Parker on the night of February 2, 2017, and into the morning of February 3, 2017. (*Id.* at ¶ 5).

Officer Gallegos investigated Quallen's allegation. (*Id.* at 12). In the course of his investigation, he interviewed several witnesses including Quallen, Quallen's roommate, Parker's roommate, Parker, and people at Coal Creek where Quallen met up with Parker on the night at issue. (*Id.*). Based on discovered evidence, Gallegos became suspicious that "some things" alleged by Quallen were untrue. (*Id.*). Gallegos and Handley decided to call Quallen in for a final interview to confront her about discrepancies between her statements, statements of other witnesses, and other discovered evidence. (*See id.* at 12-31).

During the interview, Gallegos and Handley gave Quallen a chance to present her side of the story and ask questions. (*Id.*). Regardless, Quallen claims that Defendants Gallegos and Handley used tactics that were abusive to her and did not listen to her. (*Id.* at 2). She claims that their method of questioning composed of leading and suggestive statements resulted in her retracting allegation of sexual assault. (*Id.* at 2, 6). This conduct, in her opinion, was motivated by her "sex, sexual orientation, and sexual identity," and constituted "purposeful discrimination." (*Id.*

3

at 6 ¶ 27). Quallen broadly asserts that her sexuality factored into investigation and determination of her case. (*See id.* at 4). In her opinion, the Defendants allegedly engaged in interrogation methods when questioning her about the alleged sexual assault with the goal to get a retraction of her sexual assault allegation and to "protect the accused's reputation." (*Id.*). Contrary to Quallen's claims, the attached transcript shows otherwise.

During the interview at issue, Gallegos started his questioning of Quallen in a narrative manner by summarizing discovered evidence. (*Id.* at 12-15). He first confirmed with Quallen that she, Parker, and other people met up at Coal Creek on the night at issue. (*Id.* at 12). Quallen had a couple of beers and was "a little buzzed … nothing out of the ordinary." (*Id.*). However, Gallegos pointed out that later that night, Quallen texted saying that she was "too buzzed for this." (*Id.*). Gallegos continued describing how Quallen and Parker engaged in consensual kissing and sex that night and the following morning. (*See id.* at 13-14). In his narrative, Gallegos highlighted that Quallen likely "felt a little bad" the next morning after having sex with Parker because she had "never done this before," and "this [was] maybe one of [her] first times with a man, and it was weird to her." (*Id.* at 14). She might have been "a little uncomfortable about it," "confused about that," and a "little embarrassed." (*Id.*).

Gallegos also discussed that Quallen's friend, Johnna, made the rape allegation, and Quallen only "ran with the story" instead of coming forward and saying, "I made a mistake last night, and I had sex with a guy, which is unusual for me." (*Id.*). Gallegos went on to explain that when Quallen's ROTC leadership and friends learned about Quallen's sexual encounter with Parker, she did not retract her story because she "didn't want to sound like [she was] a liar." (*Id.*). Gallegos tried to justify Quallen's decision to allege "rape" by pointing out that he did not think she was a liar or a bad person. (*Id.* at 15). He continued that people who knew that Quallen

4

preferred women over men would be confused and view her as a liar if she admitted she had consensual sex with Parker. (*Id.* at 15, 19). So Quallen decided to "roll[] with what Johnna had already pushed forward" and claim rape. (*Id.*).

After summarizing the claim at issue and identifying Quallen's reasons for false reporting, Gallegos explained to her that he and Handley would not charge her with false reporting. (*Id.* at 15, 18). Gallegos also told Quallen about the potential consequences Parker would face if convicted of sexual assault. (*Id.* at 16). He further engaged Quallen in a series of leading questions to confirm that sex with Parker was in fact consensual. (*See id.* at 16-31). Through his method of questioning, he elicited from Quallen that, contrary to what she said before, she remembered many things that happened that night, including her driving to Parker's house, being there, kissing him, and having sex with him. (*Id.* at 18-20).

Handley asked Quallen some follow-up questions and reiterated some of her statements. For example, he reassured Quallen that she found herself in this situation because of Johnna's reporting of sexual assault, and she just "roll[ed] with it to kind of save face." (*Id.* at 28). He asked Quallen to describe why she thought the morning sexual encounter with Parker was not consensual, especially in light consensual sex hours before. (*Id.* at 21). To establish that Quallen and Parker had consensual sex, he further asked to verify whether Parker used any force during the morning sex, whether she was attracted to him, whether she told him to stop, and how Parker could have thought she was fine with having sex in the morning since she had consensual sex hours before, spent the night in his house, and slept in his bed. (*Id.* at 22-23). She agreed that he could have thought "this was okay." (*Id.* at 23). Handley reiterated the consequences Parker was facing. (*Id.* at 24-25). He also sympathized with Quallen for being put in the situation she did not want because "[s]omeone put some words in [her] mouth." (*Id.* at 26). He further reiterated that mistakes happen

5

in life, and she will not be charged with anything because she was not a bad person and "deep down" was also not a liar. (*Id.* at 29).

## III. Argument

Defendants assert the defense of qualified immunity on all claims. Qualified immunity is an affirmative defense that shields government officials from suit as long as they made reasonable "even if mistaken" judgments while doing their job. *Hunter v. Bryant*, 502 U.S. 224, 227, 229 (1991). An official's judgment is not made unreasonable simply because, in hindsight, other options may have been available. *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1777 (2015). "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit." *Lewis v. Tripp,* 604 F.3d 1221, 1230 (10th Cir. 2010). To give effect to these ideals, public officials are afforded a "presumption of immunity." *Kerns v. Bader*, 663 F.3d 1173, 1180 (10th Cir. 2011).

The "heavy burden" of overcoming this presumption rests with Quallen. *See Hannula v. Lakewood*, 907 F.2d 129, 130 (10th Cir. 1990). Quallen must show both: (1) that the Defendants violated her constitutional rights; and (2) that those rights were so clearly established at the time of the alleged misconduct that every reasonable official would have understood that what the Defendants did was unconstitutional. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *Robbins v. Okla. ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1250 (10th Cir. 2008) ("it is particularly important [to] make clear exactly who is alleged to have done what to whom[.]"). If the Plaintiff fails to show that Defendants' conduct "violated federal law, the court need not determine whether the law was clearly established." *Auvaa v. City of Taylorsville,* 506 F. Supp. 2d 903, 913 (D. Utah 2007) (citation omitted).

Application of these standards to Quallen's complaint shows that her burden of overcoming

Defendants' qualified immunity has not been satisfied for her § 1983 claims.

**A. Standard of Review**

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, this Court may dismiss a complaint for "failure to state a claim upon which relief can be granted." A Rule 12(b)(6) motion is meant to assess whether the plaintiff's complaint is legally sufficient to state a claim for which relief may be granted. *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003).

In deciding a Rule 12(b)(6) motion, the Court should "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri,* 595 F.3d 1120, 1124–25 (10th Cir. 2010) (quoted source omitted). This Court may, however, also consider the attached transcript when evaluating Quallen's complaint. *See Oxendine*, 241 F.3d at 1275; *see also* Fed. R. Civ. P. 10(c). It is not bound to accept as true a "legal conclusion couched as a factual allegation." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). Additionally, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Rather, to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotation marks omitted).

Plausibility requires a two-step analysis. First, this Court identifies the allegations in the complaint that are merely conclusory, speculative, and unsupported by facts, and disregards those allegations. *Id.* at 679-81. Second, with any factual allegations that remain, this Court determines whether the allegations show that the plaintiff is entitled to relief. *Id.* at 681. This standard requires more than the sheer possibility that a defendant has acted unlawfully. *Id.* "[T]o state a claim in federal court, a complaint must explain 1) what each defendant did to him or her; 2) when the defendant did it; 3) how the defendant's actions harmed him or her; and 4) what specific legal right

the plaintiff believes the defendant violated." *Nasious v. Two Unknown B.I.C.E. Agents,* 492 F.3d 1158, 1163 (10th Cir. 2007). In sum, "where the well-pleaded facts do not permit the Court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal,* 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Quallen's claims fall short of satisfying these requirements, particularly in light of the qualified immunity defense.

**B. Qualified immunity bars Quallen's Equal Protection claim against Gallegos and Handley.**

Quallen's equal protection claim fails because she has not shown that Officers Gallegos and Handley intentionally discriminated against her because of her "sex, sexual orientation, and sexual identity." (Doc. 1 at 6 ¶ 27). The Equal Protection Clause of the Fourteenth Amendment prohibits a State from "deny[ing] to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985) (internal quotation omitted). Yet, equal protection "does not guarantee equal results for all, or suggest that the law may never draw distinctions between persons in meaningfully dissimilar situations." *Secsys, LLC v. Vigil,* 666 F.3d 678, 684 (10th Cir. 2012). In reviewing equal protection claims, the courts typically use a two-step analysis. First, the court asks "whether the challenged state action intentionally discriminates between groups of persons." *Id.* at 685. "[F]or a constitutional violation to take place, an intent to discriminate must be present." *Id.* Second, if a plaintiff can identify an act of intentional discrimination, the court will consider "whether the state's intentional decision to discriminate can be justified by reference to some upright government purpose." *Id.* at 686.

Here, Quallen has not shown "any differential treatment" by Defendants during her interview or disposition of the case which is "the material element[] of an equal protection claim."

*Owens v. Sebelius,* 357 F. Supp. 2d 1281, 1289 (D. Kan. 2005); *see also Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir. 1991); *Tonkovich v. Kan. Bd. Of Regents,* 159 F.3d 504, 533 (10th Cir. 1998) (explaining that at the heart of an equal protection claim must be an allegation of differential treatment from those similarly situated). To state a plausible claim, Quallen has to show how Officers Gallegos and Handley singled her out on the basis of her sex, sexual orientation, or sexual identity. *See generally Sebelius*, 357 F. Supp. at 1282 (citing *Bryan v. City Of Madison, Miss.,* 213 F.3d 267, 277 (5th Cir. 2000)). She failed to do so.

Quallen also does not show that Gallegos and Handley intentionally discriminated against her because of her sex, sexual orientation, or sexual identity. She bases her claim of discrimination on Gallegos and Handley's references to her sexual preference. (Doc. 1 at 14-15, 19). These references in themselves are insufficient to support her claim of intentional discrimination based on her sexual orientation. The references, if read in the context of the entire interview, constitute a justification for Quallen's false reporting and not proof of Gallegos and Handley's intentional discrimination against her. (*See generally id.* at 12-31). Similarly, Gallegos and Handley's style of questioning without showing any intentional differential treatment of Quallen from those similarly situated is insufficient to support her equal protection claim. She does not assert any facts showing that she has been treated differently from, for example, heterosexual persons making a claim of sexual assault. In fact, the transcript of her interview shows that Officers Gallegos and Handley took seriously Quallen's allegation and thoroughly investigated it. (*See id.* at 12-31). They interviewed several witnesses, including Parker, and gathered other evidence in the course of their investigation. (*Id.* at 12). They also interviewed Quallen more than once to get her side of the story. (*Id.* at 7, 12-31).

Based on Quallen's prior statements and discovered evidence, Gallegos and Handley became uncertain about Quallen's allegation of sexual assault. (*Id.* at 12-31). So, they called Quallen in to clarify some inconstancies in her statement. (*See id.* at 12). While Gallegos and Handley used a leading and narrative method of questioning, neither the style of questioning nor the type of questions they asked show their intent to discriminate against Quallen because of her sex, sexual orientation, or sexual identity. Gallegos and Handley's references to Quallen's sexual preference, when placed in the context of the entire interview, were made not with the intent to discriminate but to explain why in their view she would not retract her story and "roll[] with what Johnna had already pushed forward." (*Id.* at 15).

While Quallen may be dissatisfied with the outcome of the investigation, she failed to show that either Defendant intentionally discriminated against her. Because she failed to show that either Defendant treated her differently from other similarly situated persons and intentionally discriminated against her, Gallegos and Handley are entitled to qualified immunity.

The second prong of the qualified immunity also weighs in favor of Gallegos and Handley. Assuming that Quallen could show that Gallegos ad Handley violated her rights under the Equal Protection Clause, she would have to identify case law where officers acting under similar circumstances were held to have acted unconstitutionally. *See Ashcroft*, 563 U.S. at 741. Here, neither the method of questioning nor the type of questions asked, including references to Quallen's sexual preference, demonstrate that Gallegos and Handley intentionally discriminated against her. Without clearly established law demonstrating otherwise, both Defendants are entitled to qualified immunity on this claim.

### C. Quallen's claim of coerced confession fails because she was not charged with, arrested for, and convicted of any crime.

Quallen's claim of coerced confessions also fails on the first qualified-immunity prong.

10

Quallen asserts that Gallegos and Handley coerced her to retract allegations of sexual assault because of the threat of prosecution for false reporting. (*Id.* at 2 ¶ 9, 7 ¶ 36). Notably, she does not explain what constitutional rights they might have violated

Quallen does not allege that the statements she made during the interview were used against her in any criminal proceeding. (*See id.* at 1-32). She also does not assert that she was charged and prosecuted for false reporting. (*See id.*). She only alleges that Gallegos and Handley threatened her with prosecution for false reporting leading to her making coerced statements and retracting her sexual assault allegation, which, in her case, does not constitute a constitutional violation. (*Id.* at 7 ¶ 36).

Since Quallen does not specify which constitutional right Gallegos and Handley allegedly violated, her claim of coerced confession will be analyzed under the Fifth and Fourteenth Amendments. The Fifth Amendment, applicable to the States through the Fourteenth Amendment, states that "[n]o person shall . . . be compelled *in any criminal case* to be a *witness* against himself." U.S. Const., amend. V. Additionally, "[t]he Self-Incrimination Clause . . . cannot support . . . [a] view that the mere use of compulsive questioning, without more, violates the Constitution." *Chavez v. Martinez,* 538 U.S. 760, 766 (2003) (plurality opinion). "[M]ere coercion does not violate the text of the Self-Incrimination Clause absent use of the compelled statements in a criminal case against the witness." *Id.* at 769.

The Fourteenth Amendment provides that no person shall be deprived "of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Due Process Clause "guarantees more than fair process." *Washington v. Glucksberg,* 521 U.S. 702, 719 (1997). In *Chavez v. Martinez,* the Supreme Court explained that "[c]onvictions based on evidence obtained by methods that are 'so brutal and so offensive to human dignity' that they 'shock the conscience'

violate the Due Process Clause." 538 U.S. 760, 774 (2003) (citation omitted). However, even though a plaintiff cannot bring a § 1983 claim for a violation of the Self-Incrimination Clause when the evidence obtained against him was not used in a criminal proceeding, the Court left open the possibility that a such a suspect could bring a claim under the Substantive Due Process Clause. *Id.* at, 766, 779–80.

A substantive due process violation occurs "when state officials deprive a person of life, liberty, or property in a way *so arbitrary that it 'shocks the conscience.'*" *Dawson v. Bd. of Cnty. Comm'rs*, 732 F. App'x 624, 634 (10th Cir. 2018) (citation omitted) (italics in original). The first step in substantive due process inquiry is defining the "type" of right at stake. *See id.* at 629. "Once that baseline is established, the Court applies the level of review that corresponds to the right identified." *Id.* Thus, the Court will first "descri[be] . . . the asserted fundamental liberty interest." *Id.* (citing *Seegmiller v. LaVerkin City*, 528 F.3d 762, 769 (10th Cir. 2008)).

Here, Quallen failed to assert that Gallegos and Handley violated her rights under either the Fifth or Fourteenth Amendment, if those in fact are the amendments she claims they allegedly violated. First, Quallen has neither been charged nor prosecuted for false reporting and none of her statements made during the interview were used against her. Thus, the Fifth Amendment protections against self-incrimination was not at issue. *See Chavez,* 538 U.S. 760, 766 (2003) (dismissing the plaintiff's claim of the Fifth Amendment violation because the plaintiff was never prosecuted for a crime or compelled to be a witness against himself in a criminal case).

Second, Quallen fails to show violation of her rights under the Fourteenth Amendment since she cannot show that her liberty interests had been implicated. As stated above, Quallen faced no criminal consequences for false reporting. But even if she did, she would not be able to show a violation of Substantive Due Process Clause because nothing about Gallegos's and

Handley's behavior was conscience-shocking. The transcript reflects that they informed Quallen about their concerns with her reporting of sexual assault. (*See* Doc. 1 at 12-15). Gallegos also told Quallen that "[n]o, we're not gonna charge you. We're not gonna charge you with . . . false reporting. We're not gonna charge you with anything." (*Id.* at 15). He and Handley reassured her throughout the interview that she will not be charged with false reporting or false allegations. (*See id.* at 18, 21, 27, 29). Quallen can cite no case law placing Gallegos and Handley on notice that their interrogation would have shocked the judicial conscience. *Dawson,* 732 F. App'x at 634. Considering that there was no underlying constitutional violation, Officers Gallegos and Handley are entitled to qualified immunity and all claims against them should be dismissed with prejudice.

    **D. Quallen cannot show that either Defendant violated a duty to intervene in the absence of constitutional right violation.**

In order for Quallen to prevail on her claim of failure to intervene, she needs to first show that her constitutional right was violated, and that Gallegos and Handley failed to intervene to prevent unconstitutional acts. *See Vondrak v. City of Las Cruces,* 535 F.3d 1198, 1210 (10th Cir. 2008). Quallen's claim of failure to intervene fails because she did to show any violation of her constitutional right. Therefore, the Defendants are entitled to qualified immunity.

Law enforcement officials "have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Id.* Then, an officer who does not intervene can be liable "for the preventable harm caused by the actions of the other officers." *Id.* This applies to situations where "that officer either observes or has reason to know that: (1) excessive force is being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official." *Id.* (citation omitted). To hold an officer liable, "there must have been a realistic opportunity to intervene to prevent the harm from occurring." *Id.*

Quallen seems to allege that the Defendants failed to intervene to prevent a violation of her rights under the Equal Protection Clause. (Doc. 1 at 7 ¶ 31). However, as discussed above, she did not sufficiently allege violations of either the Equal Protection Clause, the Self-Incrimination Clause, or the Substantive Due Process Clause. Since there was no constitutional violation, there was also no obligation for either Defendant to intervene to protect her constitutional rights. Thus, the Defendants are entitled to qualified immunity.

**E. Quallen does not have the standing to bring a claim for violation of Wyoming law under 42 U.S.C. § 1983.**

In addition to her constitutional claims, Quallen also alleges a violation of Wyo. Stat. Ann. §§ 6-2-319 and 1-40-203. (Doc. 1 at 6 ¶ 21-22). Specifically, she claims that Sheriff O'Malley and his deputies showed Lieutenant Colonel Haas the video of her final interview. (*Id.* at 5 ¶ 21). To the extend Quallen alleged violations of Wyoming statutes, she does not have a cognizable claim under § 1983. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150 (1970) (emphasizing that a § 1983 plaintiff must prove the defendant deprived him of a right secured by the Constitution and laws of the United States); *Hill v. Ibarra,* 954 F.2d 1516, 1520 (10th Cir. 1992).

It is well established that §1983 "does not . . . provide a basis for redressing violations of *state* law, but only for those violations of *federal* law done under color of state law." *Jones v. Denver*, 854 F.2d 1206, 1209 (10th Cir. 1988) (italics in original); *see also Houston v. Reich,* 932 F.2d 883, 890 (10th Cir. 1991) (recognizing that a civil rights plaintiff proceeding under § 1983 must allege deprivation of a federally protected right); *Jones v. City and County of Denver,* 854 F.2d 1206, 1209 (10th Cir. 1988) (§ 1983 "does not provide a basis for redressing violations of state law.").

Accordingly, Quallen's claim of Wyoming statutes violation is not actionable under § 1983 and should be dismissed with prejudice.

## IV. CONCLUSION

For the reasons above, Defendants respectfully request this Court grant their motion to dismiss with prejudice.

DATED this 13th day of March 2020.

*/s/ Ewa Dawson*
Ewa C. Dawson, #7-6108
Senior Assistant Attorney General

**CERTIFICATE OF SERVICE**

      I hereby certify that the foregoing was served this 13th day of March 2020, by the following means:

| | |
|---|---|
| Scott A. Homar<br>Overstreet, Homar & Kuker<br>508 East Eighteenth Street<br>Cheyenne, WY 82001 | [✔] US Mail |
| Travis W. Koch<br>Overstreet, Homar & Kuker<br>508 East Eighteenth Street<br>Cheyenne, WY 82001 | [✔] US Mail |

                                            */s/ Jessica Curless*
                                            Jessica Curless, Paralegal